JOHN ANDREW HALL,

*vs.*

THOMAS M. LIVINGSTON AND JOHN W. STUTZER.

*Kent, September T., 1869.*

A parol trust may, in the absence of any prohibitory Statute, be set up, even against the grantee under a deed absolute on its face, and without any allegation in the bill that the trust was intended to be declared in the deed and was omitted through fraud or mistake.

Parol evidence is admissible to establish a trust, as against a deed absolute on its face, when, the relation of the parties, and the circumstances surrounding the making of the deed, were such as that for the grantee to set up the form of the deed as conclusive would constitute a fraud against the grantor.

Such a parol trust, may be established against an absolute deed by verbal admissions by the parties charged, and there is no such rule of evidence as to require, in such a case, proof of facts and circumstances *dehors* the deed and incompatible with the idea of a purchase.

In Eng'and, before the Statute of Frauds, 29 *Car.* II., uses and trusts might be proved by parol where the mode of conveying the legal estate was such as might be by an act *in pais* or by parol.

The Seventh Section of the English Statute of Frauds, requiring that trusts of lands be proved by writing, was never in force in this State, having been passed after the settlement of Pennsylvania which then embraced what is now Delaware, and never having been adopted by Statute or at common law in this State.

There is a well recognized distinction between contradicting a deed or impairing its legal operation, and raising out of the transaction an equity *dehors* the deed, binding the grantee's conscience to hold the land for the real purposes of the conveyance, and not according to its legal operation, when the latter use of it would, under the circumstances, work fraud.

It is upon the ground of *mala fides*, and not of mere want of caution, that the purchaser for value is affected with notice of a prior claim.

The notice must be more than would excite the suspicion of a cautious and wary purchaser, it must have been so clear and undoubted, with respect to the existence of the prior right,as to make it fraudulent in him, afterwards, to take and hold the property.

There is no difference, in principle or upon authority, between the kind or measure of notice proper to affect a subsequent purchaser, whether his title is challenged under a prior unregistered conveyance of the legal estate, or under a mere equity or trust attaching to the legal title conveyed to him.

The true object and construction of our recording act is to extend to the purchaser for value the like protection, and no more, against a prior secret conveyance of the legal estate, which, without any Statute, courts of equity have always afforded him against prior equities, merely.

The same principle applies to the grantor under a prior unregistered deed, as to the holder of a mere equity or trust, seeking to impeach the *bona fides* of a subsequent purchaser. The failure to adopt the prescribed mode of protecting himself by recording his deed is itself *laches*, in the holder of such prior deed, and thus the equities, so far as they depend on any question of diligence between the parties, are, at least, equal. So a party, who seeks to set up as against a subsequent purchaser for value, a secret trust reserved upon an absolute deed, under which possession was given up to the grantee, is himself guilty of *laches*, in not causing the trust to be inserted in the deed, and his *laches* is aggravated by his surrender of the possession which holds the grantee out to the world as the absolute owner.

Sound policy forbids that a title, bought in good faith, and paid for, should be hazarded upon the question, whether due diligence has been exercised in looking after prior latent rights, such as are not disclosed, either by the record or by the deeds under which the purchaser takes his title.

The surety in an injunction bond may be discharged in order that he may be re-examined as a witness, his deposition having been already taken through inadvertence without the removal of the disqualification and publication having passed.

While a cause is pending, the injunction bond is under the control of the Court, and the rights of the defendant under it remain subject to such disposal of the instrument, as the Court, in the exercise of its discretion, with a view to the ends of justice in the cause, may make.


BILL IN EQUITY TO ESTABLISH A PAROL TRUST IN LANDS AGAINST THE GRANTEE IN A DEED ABSOLUTE ON ITS FACE, AND FOR AN ACCOUNT OF RENTS, AND PROFITS, AND A RE-CONVEYANCE BY THE GRANTEE, AND ONE TO WHOM HE HAD SOLD AND CONVEYED A PART OF THE LANDS.—The complainant, Hall, by three several deeds, dated, two of them on the 28th, and one on the 29th of

January, 1859, conveyed to the defendant, Livingston, in fee simple, three farms situated in Kent county, Delaware. The deeds were in the usual form of deeds of bargain and sale, without any declaration of trust, and purporting to be absolute conveyances for a money consideration paid ; the consideration stated being, in one of the deeds, $1,400, in an other, $1,000, and in the third, $200. Hall, at the time of the conveyance, occupied one of the farms, and has so continued to do, but whether he remained in possession as the beneficial owner, or as tenant to Livingston, is a point in controversy. Of the other farms, Hall has had no possession since the date of the deed, Livingston occupying one of them and receiving rent for the other, until March 22nd, 1866, when he conveyed these two, farms to the defendant, Stutzer.

The bill alleges that the conveyance by Hall was made subject to a parol trust, that Livingston (who was Hall's father-in-law) should, out of the rents and profits of these farms, and the proceeds of wood and timber to be cut and sold, pay off and discharge certain liens against the premises and then re-convey them. It further charges that Stutzer purchased two farms conveyed to him with notice of this trust.

The prayer is for a decree that the trust be established ; that Livingston account for the rents and profits, and for the proceeds of wood and timber cut and sold, all which the bill charges to have been more than sufficient to satisfy the liens, and that both Livingston and Stutzer re-convey to Hall the farms now held by them, respectively.

The answer of Livingston asserts that the conveyance to him was made under an absolute purchase, without any trust or confidence, whatever, and for a money consideration amounting in the whole to $2400, of which $1800 was to be applied by him in satisfaction of certain liens

against the premises, and the residue to be applied to such other debts of Hall as the latter should approve, or to be paid directly to Hall, as he should direct. Stutzer's answer denies having received notice of any trust of the farms purchased by him, disclaims all present knowledge of such trust, and, while not admitting the alleged trust, sets up against it the equity of a *bona fide* purchaser for value paid and without notice. Thus the issues of fact presented by the record, are, (1,) the existence and terms of the alleged trust and, (2,) supposing such trust to have existed, whether Stutzer had sufficient notice of it to affect him as a purchaser. To these points a mass of evidence on both sides was read at the hearing. For proof of the trust, the complainant relied chiefly upon verbal admissions of it, by Livingston, made to several witnesses and on different occasions. As counterproof, upon this issue, the defendants adduced evidence of sundry transactions between Hall and Livingston of a nature inconsistent with the existence of any trust, also of like inconsistent declarations on the part of Hall, made upon two occasions. The material facts of the evidence are more particularly set forth in the opinion of the Court.

On the 22nd of December, 1869,—*Comegys*, for the complainant, applied for an order to discharge Wm. A. Hall, the surety in the injunction bond, in order that he might be re-examined as a witness, his deposition having been already, through inadvertence, taken without removal of the disqualification. The deposition and all the testimony had been published. Mr. C. stated that neither he nor his client had read any of the depositions, nor were acquainted with their contents.

*Ridgely* and *Smithers*, for defendant, without questioning the good faith of the application, objected, *first*, that to discharge the surety or by any means to affect his liability under the bond, would be to impair the obligation of the contract, a power prohibited to the Court by the

Federal Constitution ; and, *second*, that, at all events, the application came too late, being after publication passed ; that to allow any further testimony after publication passed, would give the complainant an undue advantage in knowing from the testimony published, any deficiencies in his proof, and is against the practice of the Court.

THE CHANCELLOR :—

The present application is that William A. Hall may be discharged from his suretyship in the injunction bond, or that the bond may be canceled and a new bond taken, as may be in accordance with the powers and practice of the Court ; that the deposition of Hall already taken be suppressed, and the witness re-examined upon the same interrogatories and cross interrogatories.

The defendants object, *first*, the want of power in the Court to discharge this surety, since that would impair the obligation of a contract within the prohibition of the Federal Constitution.

Doubtless, the injunction bond is a contract, what is termed a contract executed ; and out of it there do spring obligations and rights, which, whatever they may be, and with such qualifications, if any, as attach to them, rest upon contract, and are within the protection of this clause of the Constitution. Were this cause to proceed to a hearing, and the injunction to be dissolved, the bond remaining in force and being then delivered to the defendant, as it would be, under the order of this Court, then the right of defendants to redress upon it, and the obligation of the surety to respond having become vested and indefeasible, would be beyond the reach of any power, legislative or judicial.

I am of opinion that while this cause is pending, the bond is under the control of the Court, and that the rights

of the defendants under it remain subject to such disposal of the instrument as the Court, in the exercise of its discretion, with a view to the ends of justice in the cause, may make.

This was not a bond executed and delivered by one party to the other for a consideration received, the ordinary case vesting immediately and subject to no control or contingency as to the rights and obligations imparted by it. It is a security taken by the Court without any privity of the defendants, upon no consideration passing from them ;—it is what they could not have required, and what no law or statute·required, but was taken by the Court *sua sponte* to serve the justice of the cause, as that shall appear to its own judgment,—when taken it remains, according to uniform practice, in the custody of the Court, not delivered to the defendants ; nor could the defendants obtain possession of it, but under the order of the Court at the termination of the suit.

The result is that this bond, though taken in the name of the defendants, and intended for their benefit in a certain contingency, is not yet their property. It has not been delivered to them, nor is there any ground upon which, supposing the defendants stood in a like relation to a private party, as they now do to this Court, they could compel a delivery, or assert an equity to the benefit of it without a delivery. It must abide the disposal of the Court until the cause is determined.

I have considered with some anxiety what objection there might be to this view of the present condition of the bond, and can find none. In the first place, it violates no rule of law as to the effect of a sealed instrument. A deed may be signed and sealed and delivered conditionally or in a qualified manner, so as to pass from the control of the grantor or obligor, and yet not vest an immediate and indefeasible title or right in the grantee or obligee. Such is

45

the ordinary case of an escrow. The instrument may be delivered into any third custody, to take effect upon any conditions, or subject to any contingencies, whether stipulated for expressly, or implied from the circumstances and objects of the transaction. There is, then, no technical difficulty in treating this bond as executed, and, so far as the obligors are concerned, as delivered, but remaining temporarily in the custody and control of the Court, so as to effectuate the objects contemplated by the order under which it was taken.

Again, no right of the defendants is infringed by holding the bond under the control of the Court pending the cause. For as yet, no right of defendants has attached to the instrument. Being taken in the discretion of the Court it remains subject to that discretion until, by delivery, a legal right to the instrument is created.

Again, there is no cause for sensitiveness, that ultimate justice to the defendants is left at risk through the Courts retaining control of the bond. The same sound discretion and sense of justice to which our laws have confided the taking of any bond at all, may as well be trusted to hold and dispose of it so as to secure the just rights of parties; while, on the other hand, the exercise of such a control until the cause is determined, may be often convenient for the ready correction of mistakes to which the bonds, taken as they are out of Court, and not under the direct supervision of the Chancellor, are liable, and sometimes a change or substitution may become necessary to justice, as in the present case, where the surety is found to be a material witness. The disqualification of the witness may result from no fault of the party who would be affected by the loss of his testimony. The materiality of his testimony might arise, or it might be discovered after he has become surety. A party cannot, upon principle, be held to be apprized of all the testimony which will be

material before the cause is pleaded to and at issue ; nor ordinarily is this practicable ; so that without a reserved control of the injunction bond, pending the cause, gross injustice might ensue. Further, the weight of authority is in accordance with this view. It has been a uniform practice in the Courts of England, and of this country, to discharge sureties held under what may be termed judicial securities, in order to qualify them as witnesses in the cause, in the course of which the security was taken. The principle is, that the security taken, whatever be its form, whether recognizance of bail, or bail bond, replevin bond or stipulation for costs, is subject to the control of the Court in which it is taken, pending the cause, so far as justice in that cause may require, and that these judicial securities being taken subject to such control, its exercise does not impair any obligation arising therefrom. See, for examples, 2 *Greenl. on Ev.*, *Sec.* 392, and cases cited, and *Sec.* 430. . We have a statute to the same effect, which, however, must be taken as declaratory of a power already existing. The like control of this Court over an injunction bond rests on even clearer grounds, in as much as such bonds are taken by the Court in the exercise of its own judicial discretion, and are not like some of the securities, directed by Statute.

The decision in Maryland, *Arty and wife vs. Grove*, 21 *Md. Repts.*, 456, I have considered with great respect, but am obliged to dissent from it. I do so with the less hesitation because the question in that case was a subordinate one, and concerned only a small interest, viz : one item of credit to the amount of $68 in an account ; and the remarks of the Court do not show that much consideration was given to it.

But it is further objected that, supposing the Court have power to discharge the surety, it is now too late to allow his re-examination, in as much as his deposition already taken as well as the testimony at large, has been

published. It is suggested that his re-examination now would afford the complainant an undue advantage in the opportunity to supply any defects of proof which might be disclosed by the evidence already taken. This objection would have force against the examination of the witness as to new matter after his testimony has been once taken, but not to his re-examination upon the same interrogatories, and cross interrogatories.

If the witness shall reiterate his former testimony, the case will stand upon precisely the same proof as if he had been originally competent, and the deposition first taken were read at the hearing. If he varies from his first statements the defendants have the advantage of the self-contradiction. Statements of any new matter will not be permitted to be introduced.

The rule is, that the re-examination of a witness is against the ordinary practice, but is allowed by special order upon grounds satisfactory to the Court, as in the case of clearly accidental mistake on the part of a witness, or of the examiner. *Kingston vs. Tappan,* 1 *Johns. Ch.,* 368 ; *Denton vs. Jackson, Ib.,* 526 ; 1 *Smith's Ch. Pr.,* 358 *note* (*a*) ; or where the depositions already taken have been suppressed for some irregularity which the Court is satisfied was accidental and unintentional. See, at large, 2 *Dan. Ch. Pr.,* 1150-1156, and 1 *Smith's, Ch. Pr.,* 395. In *Healey vs. Jaggar,* 3 *Simons,* 494, a plaintiff having by mistake omitted to file a replication before he examined his witnesses, leave was given to him, notwithstanding publication had passed, to re-examine his witnesses on the interrogatories already filed, but not to examine any new witnesses. There are cases in which a re-examination after publication passed, has been allowed for the purpose of rendering a witness competent. *Callow vs. Mince,* 2 *Vernon,* 472, and *Sandford vs. Paul,* 3 *Bro. Ch. Rep.,* (370,) are direct decisions on the point, the latter

of Lord Thurlow, on great consideration, and after an examination and report to him by Mr. Dickens of the prior cases and course of practice. This case is most fully reported in 1 *Vesey, Jr.*, 498, and 2 *Dickens*, 750. In *Wood vs. Mann.*, 2 *Sumner*, 316, Judge Story reviews, very thoroughly, the whole subject, stating, upon authority, the various circumstances under which, after publication,further testimony, or the re-examination of the same witnesses will be permitted, and among these, (*p.* 323,) is put the present case. "Another class of exceptions," says, the learned Judge, " is where depositions have been suppressed "from the interrogatories being leading, or for irregularity, " or *where it has been discovered that a proper release has* "*not been given to make a witness competent ;* in every "such case, from the obvious necessity and in further- "ance of justice,fresh interrogatories and a re-examination "have been permitted." *Haddix vs. Haddix* 5 *Litt.*, 202, is cited in 1 *Smith Ch., Pr.* 358, *note* (*a,*) as deciding that "a " witness examined while incompetent by reason of inter- "est,may be re-examined after his competency is restored."

Certainly these applications should be entertained with great jealousy and circumspection ; but the present application presents all those features which the Courts, in their most cautious exercise of this discretion, have required. The evidence of this witness is material to the issue, and its admission will be to the furtherance of justice in the cause :—the taking of it without the previous removal of the disqualification of the witness was through inadvertence, and that of a kind not involving neglect, being such as all counsel are liable to : the application is made in good faith—and to grant it involves no delay of the cause nor surprise upon the defendants, nor any other prejudice than the effect which the testimony itself may have at the hearing, which, of course, is a consequence not to be considered.

The cause came on to a hearing at an adjourned September Term, 1869.

*Comegys*, for the complainant.

This case presents two general questions, (1,) whether the fraud is proved as alleged, and, (2,) whether Stutzer is affected by notice of it. ·

*First.* The proof shows that Hall, a man of weak capacity, embarrassed, beyond his own ability, for relief applies to Livingston. The result was a conveyance absolute on its face, but, in fact, subject to the trust alleged.

In this State a trust of lands may be shewn by parol. The seventh and eighth sections of the English Statute of Frauds were not re-enacted here and not having been re-enacted are not in force. It must be presumed to have been omitted, designedly, from our Statute.

But supposing this case to be governed by the Statute of Frauds, or the defense properly taken under it, there arises a preliminary answer to this objection, that the Statute, or that feature of it, is not pleaded in the answer. The omission of a statutory defense is a waiver. The pleadings present as the issue of fact, whether a parol trust was created, its invalidity under the Statute being waived. *Mitf. Eq., Pl. (Tyler's Ed.)*, 356; 1 *Dan. Ch. Pr.*, 747; *Hill on Trustees*, 61, *note* (2) The principle is that the issue must arise out of the record. In cases where the Statute is relied on it is always pleaded. *Movan vs. Hays*, 1 *Johns. Ch.*, 339; *Brown vs. Carson, Busbee*, 272; *Lamb vs. Pigford*, 1 *Jones Eq.*, 196; *Briggs vs. Morris*, 1 *Jones Eq.*, 193; *Flagg vs. Mann. et al.*, 2 *Sunn.*, 486.

This is not a deed of bargain and sale. It is admitted by the answer that no consideration was paid, and this meets the objection that we cannot, against the deed, aver the want of consideration. If there was no consideration we may inquire what use passed; the Statute of

Uses executes only uses arising from a consideration of money, or value paid or given, not a contract or anything *in fieri, Roberts on Frauds,* 91. The answer admitting the falsity of one of the most solemn averments of the deed, the whole question of consideration is open, and the question, what it was, is the very question opened to the Court by the pleadings. Besides, the answer sets up in defense another parol trust, and we may meet it by shewing the true trust. Thus the answer raises the issue of trust or no trust, and opens inquiry into the facts of the case, which present a case peculiarly for equitable interference, relieved by the answer from the restraint arising from the technical effect of a deed.

Again, the exclusion of parol testimony to prove what is in writing, does not apply where an agreement originally parol is partially reduced to writing ; what is not in writing. is enforced collaterally and not through the contract as reduced to writing. 1 *Gr. on Ev.,* § 284, *a.*

Upon the evidence, a parol trust is clearly proved, and the facts are entirely inconsistent with the idea of a sale. Hall lived on one farm as owner, and so acted and dealt with it ; he never paid any rent, but rented out part, and received rents ; he cut wood on these lands, and sold it to Livingston, who, upon the proof, is shewn to have been clearly unable to buy.

Against the proof adduced by complainant, the reliance is upon the papers signed by Hall. These and their effect must be considered in the light of all the circumstances. Hall's incapacity, his relationship to Livingston, and dependence upon him, and Livingston's proved control and direction of the whole proceeding with Hall's utter passiveness. Livingston was a self-appointed guardian, and Hall clearly did not understand the effect of these papers. The very office of a court of equity is to look behind formal papers and get at the real transactions and motives and aims of parties.

*Second.* With respect. to Stutzer's defense, it is shewn that he had notice clearly sufficient within the authorities. *Jackson vs. Caldwell,* 1 *Cow.,* 625 ; *Pearson vs. Daniel,* 2 *Dev. & Bat.,* 365 ; *Winborn vs. Gorrell,* 3 *Ired. Eq.,* 117 ; *Polk vs. Gallant,* 2 *Dev. & Bat.,* 395 ; *Blake vs. Heyward,* 1 *Bailey's Eq.,* 208.

*Smithers* and *Ridgely,* for defendants.

*First,* as to the defense of Livingston.

1. It is a general rule that a complainant can only recover upon the case made by the bill.

There is no allegation of fraud in obtaining the deed, nor of error or mistake in the form of the conveyances, nor that in form they are other than intended. The case set up by complainant is, that they are subject to a trust *dehors* the deed, a secret, parol trust to hold the lands and apply rents and proceeds of wood and timber to pay off Hall's debts and re-convey. Hall well knew the absolute character of the deed on its face ; no fraud is alleged in its inception, only in refusing to carry out the trust.

That there was any intention to create such a trust is highly improbable. Hall was so deeply involved, his personal property sold, lands likely to follow ; the case was hopeless. The only difference to him was, if Livingston got it he would have a home.

2. It is not settled in this State that a parol trust of lands can be set up at all. *Waters vs. Comly,* 3 *Harring.* 117 ; *Newells vs. Morgan,* 2 *Ib.,* 225 ; *Roberts on Frauds,* 91, 93—4

In England, under the Statute, 29 Car. II. Section 7, no trust could be created except by writing (except some by operation of law under Section 8.) This was re-enacted in some of the states, though not in

Pennsylvania, Delaware or North Carolina, but even there a resulting trust under Section eight, cannot be proved by parol.

*Moran et al., vs. Hays,* 1 *Johns. Ch.,* 339 ; *Steere vs. Steere,* 5 *Ib.,* 1 ; *Botsford vs. Burr,* 2 *Ib.,* 405. This may be taken to be the law in all the States where the English Statute has been re-enacted or held to be in force. If Section 7, of the English Statute is in force here, that is. conclusive.

3. But even if that Statute is not in force here, no parol trust of lands can be established by mere declarations or admissions of the parties to be charged, but only by facts and circumstances *dehors* the deed, inconsistent with its absolute character. But in Pennsylvania and North Carolina, it is held that facts, and not admissions only, must appear. *Jackman vs. Ringland,* 4 *Watts & S.,* 149, 150 ; *Sample vs. Coulson,* 9 *Watts & S.,* 62, 65-6 ; *Kelley vs. Bryan,* 6 *Ired. Eq.,* 283 ; *Sowell vs. Barrett, Busbee,* 50 ; *Brown et al., vs. Carson's Ex'r and devisee, Busbee,* 272 ; *Clement vs. Clement,* 1 *Jones Eq.,* 184 ; *Briggs vs. Morris,* 1 *Jones Eq.,* 193 ; *Lamb vs. Pigford et al.,* 1 *Jones Eq.,* 196.

4. Such declarations as are proved in this case are not of that clear, unequivocal character as should be required to set aside a solemn deed, not even if they stood alone. Admissions are an unsafe mode of proof, liable to be misunderstood, easily fabricated, hard to disprove, and to be received with great caution, requiring strong corroboration.

And any inference which might be drawn from the complainant's testimony is, in this case, conclusively rebutted by the evidence for the defendants. The papers and the declarations, as construed in behalf of complainant, are wholly inconsistent, and one or the other must

46

give way, and all considerations weigh most strongly in favor of the papers.


*Secondly*, as to the defense of Stutzer.

This part of the case rests upon a purchase for value, and without notice. The payment of the purchase money is clear, and Stutzer's care and diligence were beyond criticism.

There is in this case no notice proved, but the alleged notice is insufficient to charge Stutzer with knowledge of the trust if there were one. *Sugd. on Vend. Ch.*, 17 *p.*, 532 ; *Wildgrove vs. Wayland*, cited by Sugden ; *Hill on Trustees*, [510] ; *Le Neve vs. Le Neve*, 2 *Wh. & Tud. L. Cas. in Eq.*, [35] ; *Rogers vs. Jones*, 8 *N. H.*, 264.


THE CHANCELLOR :—

The grounds of defense taken in argument were two-fold ; one that the evidence was not competent in point of law to establish the alleged trust, the other, that it was insufficient to prove the trust as a matter of fact. Let us take up these objections in order.

The argument of the first objection, *i. e.*, the competency of the evidence, raised three questions of law.

First, was the broad question, treated in the argument as yet unsettled, whether, in this State, a parol trust of lands can be set up at all. If it cannot be, then the case is ended upon the threshold.

My great respect for even the doubts of the learned and experienced counsel for the defendant, and a desire not to leave, in any degree unsettled, in this Court, a question of so much importance, has led me to examine it thoroughly with this result.

· That, in England, uses or trusts before the Statute of Frauds, 29 Car. II, might be proved by parol, or, to use the more common phrase, that they were "averrable," at least, to a large extent, the fact that such a Statute was deemed necessary, sufficiently demonstrates ; but the modern text books, (*Lewin on Trusts,* (57) ; *Hill on Trustees,* [561], 2 *Sto. Eq. Jur.,* § 971,) treat it as quite uncertain whether at that period parol trusts of lands were, *under all circumstances,* valid. They do not, however, attempt to extract from the decisions, prior to 29 Car. II, any intelligible rule on this subject, but leave the question, how far trusts might, before the Statute, be declared or proved by parol, to rest upon a distinction suggested by Ch. Baron Gilbert, in his work on Uses and Trusts, p. 27.

· The distinction put by the Ld. Chief Baron, as one likely to harmonize the earlier cases was, that where the mode of conveying the legal estate was such as might be an act *in pais* or by parol, the uses or trusts of the legal estate might be declared by parol ; but where, as in the case of a few only of the old common law assurances, the conveyance of the legal estate could only be by writing, the uses of such conveyance must also be ·declared in writing.

I have examined the passage from Gilbert, and the cases cited by him, and all other authorities of that period which are accessible. Quite a laborious investigation of the subject has led to the conclusion that, under the old modes of conveyancing which were in use prior to 29 Car. II, excepting only two of them, the uses of the land conveyed, (or the trusts of the same, after trusts had succeeded to the ancient use under the Statute of Henry VIII,) might be declared by parol. This was true as to lands when conveyed in the earliest times by feoffment and by fine levied of the freehold, and, also, as to lands conveyed by that form of assurance which superseded these, and which now prevails, viz ;—the bargain and sale.

The exceptions were the covenant to stand seised to uses, which, together with the uses declared, was required to be in writing ; also the uses of a fine when levied of a rent, a rent being in grant and not in livery. It need hardly be added that these two excepted forms of conveyance are unknown among us, and can afford no rule applicable to the present case.*

*The entire passage from Gilbert reads thus :—

" It seems, at common law, a use might have been raised by word, upon a " conveyance, that passed the possession by some solemn act, as by a feoffment; " but when there was no such act, then, it seems, that a deed declaratory of " the uses was necessary; for as a feoffment which passed the estate might be " made at common law by parol, so, by the same reason, might the uses of the " estate be declared by parol, but where a deed was requisite for the passing " of the estate itself, it seems, it was requisite for the declaration of uses, as " upon a grant of a rent or the like. So, it seems, a man could not covenant " to stand seised to a use without a deed, there being no solemn act; but yet a " bargain and sale by parol has raised a use without, and it has been held to " do so, since the Statute, in cities exempted out of the Statute. It has been " held that if a fine be levied of a rent, no use can be limited of it without " deed; but now by 29 Car. II. C. 3, all declarations of trust, other than such " as arise by implication of law, are to be in writing, and signed by the party " who is, by law, enabled to declare such trust, or else it must be by his last " will in writing. 2 *Roll.* 788 ; *Collard vs. Collard*, *Pop.* 49 ; *Moor*, 688 ; 2 " *Inst.* 675 ; *Jones* vs. *Morley*, *Holt*, 321 ; *Dyer*, 229 *a.*"

It will be observed that, in this passage, the question, under which forms of conveyance uses might, and under which they might not, be declared by parol, is governed by a distinction between those conveyances which, at the period, referred to might be made by parol, and those which required a deed in order to pass the estate upon which the use was to be raised. Says the learned Ch. Baron, " as a feoffment which passed the estate might be made at common law " by parol, so by the same reason might the uses of the estate be declared by " parol, but where a deed was requisite for the passage of the estate itself, it " seems, it was requisite for the declaration of uses. " This distinction will be found fully to harmonize all the early cases, and must be taken to have been the one applied by the Courts to the several forms of conveyance. Thus, with respect to a feoffment, the primary mode of assurance, inasmuch as it might be made without a deed, so the uses of the estate conveyed might be declared without a deed, though a written declaration of the uses came frequently to at-

But the seventh section of the English Statute of Frauds, the section which requires that trusts of lands be proved by writing, was never in force in this State. That Statute passed in the twenty ninth year of Car. II., did not extend to the then settled colonies,—among which were Pennsylvania, embracing, what is now, Delaware. It was early decided by the Privy Council of England upon appeal to the King, in Council, that an English Statute does not bind a colony settled prior to its passage, unless the

---

tend the feoffment   So, upon a fine levied of the freehold, the uses of the freehold might be declared by parol. *Gilbert on Uses* (54-5-6); *Cornish on Uses*, 3 *Law Lib.*, (163); 4 *Reeves Hist. Com. Law.*, 161. This was because a fine was, in substance, but an acknowledgment of record that a feoffment had previously been made by the conusee to the conusor. From this presupposed feoffment the fine received its force as an evidence of title; and as thus the source of the estate conveyed under a fine was a supposed feoffment, which might have been made by parol, so the uses of such an estate might be declared by parol. But, further, there succeeded to both the feoffment and the fine, another mode of conveyance, which illustrates how little writing was deemed a requisite to the creation of the ancient use. This was the bargain and sale. I refer to this now as a common law conveyance before the Statute of Uses. This bargain and sale, prior to the Statute, was a mere contract of sale by one holding the legal estate, made for a valuable consideration, upon which, although no legal title passed, yet, out of respect to the consideration, equity raised and enforced the use or beneficial interest. Thus the consideration of a bargain and sale received the like force to support the use bargained for, though by parol, which, under a feoffment, the solemn act of livery of seisin had to support a parol declaration of the uses to which the feoffment was made. Now, this contract of bargain and sale might be by parol ; and thus in a very large class of cases, uses came to be created by parol. For as we learn from *Reeves' History of the Common Law, 4th Vol.*, 161, the common law bargain and sale, as a method of conveyance had obtained as early as Henry VII, being extensively introduced in that reign in consequence of a Statute of Richard III, which had given, to all *cestuis que use*, a power concurrent with the person holding the legal estate, to make the common law conveyance by feoffment and gift. There is abundant authority that parol uses were raised out of a mere verbal bargain and sale, for a valuable consideration, before the Statute of 27 *Hen.* 8, a section of which, requiring a bargain and sale to be enrolled, made a deed necessary to this form of conveyance, and even after

Statute be expressly extended to such colony. 3 _P. Wms_, 74 ; 1 _Jac. and Walk._ 22 ; 1 _Blk. Com._, 109 ; Ld. Mansfield in _Rex vs. Vaughan_, 4 _Burr_, 2500. The Statute of Frauds, in connection with the supplement to it of 25 Geo. II., bears internal evidence that it was not supposed to extend to the colonies ; for the provisions of the supplement are, by Sec. 10, expressly extended to those of the colonies, and those only, which, by their own usage or legislative acts, should have previously adopted the orginal Statute of 29 Car. II.

Nor does it appear that the seventh section of the English Statute of Frauds, or any corresponding rule of

---

that Statute, in certain cities which were excepted out of its operation, uses continued to be raised from parol bargains and sales. See _Gilbert on Uses and Trusts_ (88), (286) ; _Chibborne's Case in_ 6 _Eliz. Dyer_ 229 _a_ ; _Baynton's Case in_ 6 _and_ 7 _Eliz._ cited _in Popham_ 49; _Collard's case, Pop._ 49; 2 _Co., Inst._ 675; _Fonbl. Eq., Book II., Ch., II., sec._ 3; _Roberts on Frauds_, 93. There were only two ancient modes of conveyance in which a use could not be raised by parol. One of these was the covenant to stand seised, which was required to be by deed in order to raise the uses covenanted for; and this because the consideration for this species of conveyance was only blood, or a consideration not deemed of sufficient force to raise a use without deed, as was money the consideration of a bargain and sale. This was the point so much discussed in _Collard's Case, Pop._ 49. The other instance in which a use could not be raised by parol was upon the grant of a rent, or upon a fine levied of a rent; because, always, a rent could be created only by deed.

These are the two instances put in the passage cited from Gilbert, and none others can be found in the early cases, in which, prior to the Statute of Frauds, 29 _Car. II._, parol evidence, was held inadmissible to establish either a use on lands before the Statute of Uses or trust, since that Statute ;—trusts, since the Statute of Uses, having succeeded to all the incidents of uses before that Statute.

A further remark is necessary, with respect to bargains and sales, and the effect of their being required to be in writing, under 27 _Hen., VIII. C._, 16. It is not to be inferred that the effect of that Statute was to preclude parol trusts after the legal estate in lands came to be conveyed by bargain and sale.

·evidence, touching trusts of land, has ever been adopted by statute, or at common law, in this State. On the contrary, the continued omission, until this day, of that section out of our Statute of Frauds, a statute which has been in force as far back as 25 Geo. II., must be taken as a legislative disapproval of the policy of that section ; and, as might be expected, our Courts have never, in the face of so clear an evidence of the will of the Legislature, attempted to adopt such a rule, as a judicial one. We may, then, conclude that, in this State, there being no law restricting the mode of creating or proving trusts of land, they may be created and proved by parol.

This conclusion has been reached in other States wherein the seventh section of the Statute of Frauds has not been re-enacted, or had not been when the question was raised. It will be instructive to see how the subject has been treated in these States.

---

The enrollment was required in consequence of the effect which, under the same Statute, the bargain and sale was to receive as a new species of conveyance of the legal estate. The Statute requiring enrollment, clearly, was intended to guard against secret conveyances of the legal estate, and had no view to creating any kind of evidence as to trusts which might be engrafted on the legal estate ;—and though logically, according to the old distinction, before stated from Gilbert, when the bargain and sale as a species of conveyance was required to be by deed, any trust of an estate passed under such deed should have been by deed also, yet, it must be considered as certain, that parol trusts of lands held under a deed of bargain and sale after the Statute of enrollments were sustained as a parol bargain and sale to uses was before that Statute. The question seems never to have been raised and the Statute of Frauds passed so early as 29 *Car. II.* disposed of the whole subject. That Statute is itself demonstration that before its passage, trusts of lands were, to a large extent, raised by parol, and that this must have been so with respect to lands passing by deeds of bargain and sale, for that these deeds had long before the 29 *Car. II.*, taken the place of the old common law assurances by feoffment and fine, and become the prevailing mode of conveying real estate.

In Pennsylvania, prior to the adoption of the seventh section of our Statute of Frauds, in 1856, the decisions for a time fluctuated upon the question whether the old Statute of Frauds in that State, of 1772, did not, by some peculiar phraseology, prohibit parol trusts of lands ; but, finally, it was settled to the contrary by one of Ç. J. Gibson's masterly opinions in *Murphy vs. Hubert, 7 Pa., St.*, 420. The Court, in that case, after finding no statutory prohibition in their way, proceed, without hesitation, to affirm the validity of a trust arising out of a verbal agreement by a grantee under a deed, absolute in form, to hold for the benefit of the grantor. .

In a case in Virginia, *Bank of the U. S. vs. Carrington et al., 7 Leigh*, 576, the question respected the admission of parol evidence to establish a trust resulting to one who had paid the purchase money, another being named as grantee in the deed. The whole subject of parol trusts, express, as well as resulting, and the effect of the omission, in that State, of the seventh section of the English Statute of Frauds, was examined, the several judges who expressed opinions, all concurring in the validity of parol trusts, in the absence of the statutory prohibition. Tucker, President, says : "Before that "Statute, declarations of trust might have been made by "parol, and as our Statute contains no provision on the "subject, it is possible that a verbal declaration of trust, "if clearly proved, might be sustained. I imagine it has " not infrequently occurred in Virginia that husband and " wife have conveyed to a third person, with intent that "he should reconvey to the husband, but without any "written declaration of trust. A case of this kind has "recently occurred and is under advisement. Yet I have " never heard it questioned that it might be sustained, " though not in writing, and though it be not a resulting " trust. So with respect to deeds, absolute on their face, " when the real transaction was a mortgage. Whatever

" may be the doubts elsewhere, it has been, with us, long
" established, that the equity of redemption may be
" sustained by parol evidence, and that a deed, absolute
" on its face may, by such evidence, be turned into a
" mortgage."

In Ohio, the question arose in *Fleming vs. Donahoe,*
5 *Ohio*, 255. In that State there was no Statute against
parol trusts of lands before 1810. In 1808, lands of which
one Fleming held the equitable title, were conveyed
under his direction to his daughter Mary, by a deed, abso-
lute in form. The bill was filed by Fleming, heir-at-law,
against Mary's representatives, for a re-conveyance, upon
the ground that the conveyance to Mary was upon certain
trusts for the benefit of herself and her father, which had
expired upon the death of both. The answer denied the
trust, and testimony was taken. The Court say, touching
the absence of any Statute of Frauds, at the date of the
deed affecting the proof of trusts, "The Statute of
" Frauds in Ohio was passed in 1810. At that time there
" was no law in Ohio prohibiting parol contracts concern-
" ing lands, or the creation of trusts in them."

In North Carolina, where the English Statute has
never been re-enacted, the validity of parol trusts was
first questioned in *Foy vs. Foy*, 2 *Hayw.* 296, in 1801.
Thomas Foy, a brother of both the parties, held a tract
of land, together with the defendant, Foy, the legal title
being in the defendant Foy, but Thomas being equitably
entitled to one-half. Thomas dying intestate, as to this
land, the dispute concerned the succession to his equitable
moiety, the plaintiff, as one brother and heir-at-law,
claiming a share of the moiety, and the defendant, the
other brother, claiming to retain the whole of Thomas'
moiety under certain parol declarations to that effect made
by Thomas in his lifetime. The Court, upon objection
being taken that the moiety of Thomas "could not pass
" to defendant by Thomas' mere parol declarations," took

47

time to consider, and finally decided that the parol evidence was sufficient.   They say, "the Statute of Frauds "in England enacts that no creation of a trust, or declara- "tion of one, shall be proved by parol evidence ;  whence "it was to be inferred that before that act such parol "declaration was valid, and our law is the same as in " England before that Statute."     .

It should be here remarked, that in the long series of cases in North Carolina since *Foy vs. Foy*, in which parol trusts of lands conveyed by deed, absolute in form, have been so much considered, it will be found that the validity of such trusts has not been overruled, but the question has been, what species of evidence the Court should require to establish a parol trust against a deed, absolute in form, whether verbal admissions of the trust by the grantee are alone sufficient.

That is a question yet to be considered in this case.

In Tennessee, where the English Statute has not been re-enacted, it has been held to be well established that the Court of Chancery has jurisdiction " to enforce the spe- "cific excution of a trust, declared by parol, in relation to "real property, if plain and unambiguous in its terms and established by clear and satisfactory evidence." *Haywood vs. Ensley*, 8 *Hump.*, 466 ; 6, *Hump.* 99 ; 1 *Yerg.* 100.

We come now to the second question raised in the argument, touching the competency of complainant's evi- dence to establish the trust—viz : whether even if, in the absence of a prohibitory statute, parol trusts generally are admissible, one can be set up (as in this case is attempted) against the grantee in a deed, absolute upon its face, without an allegation and proof that a declaration of the trust was intended to be inserted in the deed, and was omitted through fraud or mistake.

The learned counsel for the defendant did not strongly press the argument so far as to exclude parol trusts alto-

gether, as against the grantee in an absolute deed, but they rested more on the ground, that, to charge the grantee, proof of his verbal declarations alone was insufficient. However, the scope of the argument and the authorities cited, drew into question the validity of any parol trust, however proved, if not in writing, when set up against an absolute deed, unimpeached for fraud or mistake.—The question must be considered ; for such an objection, if tenable, is decisive without going further.

The question, as it applies to this case, admits of two answers.

1. According to the allegations of the bill and the admissions of the answer, such were the relations of these parties, and the circumstances under which the deed was made, that to set up the form of the deed as conclusive against proof of the real transaction, would be a fraud on the part of Livingston. The case is this upon both bill and answer ; Hall, an illiterate, confiding young man, unable to read or write, with not the least knowledge of legal forms or instruments, wholly incompetent to manage his own affairs, becoming involved, and likely to lose his property, comes, somehow or other, it matters not to this point, how, under the advice and management of Livingston, who is his father-in-law, a man competent to deal with the business in hand, and to whom it is wholly confided by Hall. In all essential respects, Livingston assumed the relation or office of a guardian. The deeds are prepared by a scrivener whom he employs, under his exclusive direction, are taken to Hall's house, read over in the usual way, without explanation, either asked or given, and signed by him alone, his wife being then sick. It does not appear that the papers were left with Hall until his wife should be able to execute them ; the presumption is that they remained in the same custody, the scrivener's, and were kept by him until some three weeks after, when Hall and his wife went to Milford, and she

there executed the deeds.    There is no proof of what
transpired at Milford ; and nothing is to be presumed.
The whole is the ordinary case of the almost mechanical
execution of papers which ignorant and confiding parties,
unacquainted with legal forms, take for granted will
effectuate the purpose intended.

Now, upon these undisputed facts, I take it to be clear
upon principles of equity, so fundamental and settled as to
need no reference to authorities, that Livingston, assuming
the sole superintendence of the business for an ignorant
and confiding son-in-law, was bound to see that the
papers were such as would effectuate the intention of the
parties, whatever that purpose might be.   That, under
such circumstances, to set up the absolute form of the
deeds against evidence of his real transaction, would be
contrary to good faith, and afford extreme facility for
fraud, and, upon these two considerations, cannot be
permitted in a court of equity.   It matters not however
innocently an omission in the deeds, supposing there was
one, may have occurred in the first instance.   Nor can it be
that Livingston's duty in the premises was at all discharged
by a mere formal reading of the papers in Hall's presence,
as the usual preliminary to their execution ; for it is not a
natural or fair presumption that Hall would, from such a
reading, comprehend the technical operation of the papers,
but, rather, that he would unreflectingly accept them as
answering the purpose, distrustful of his own ignorance,
and confiding in his father-in-law.   Touching his knowl-
edge of such a transaction, so managed, nothing should
be presumed.

Upon this ground, therefore, I must hold parol evi-
dence admissible to shew the real object of these deeds.
But,

2. In the second place a *patient investigation of the*
whole subject leads to the conclusion that independently

of the special ground before referred to, a parol trust may, in the absence of any prohibitory statute, be set up, even against the grantee, under a deed, absolute on its face, and without any allegation in the bill that the trust was intended to be declared in the deed, and was omitted through fraud or mistake.

It is certainly true, that a deed cannot be contradicted, nor can its legal operation be varied by extrinsic evidence, no more by written than by parol—by nothing short of an instrument of like solemnity, *i. e.*, an instrument under seal.   This is a rule as binding in equity as at law ; for, though a court of equity may reform the writing, when, through fraud or mistake, its terms are not what they were intended to be, yet, so long as the instrument stands as the deed of the parties, it can no more be contradicted, or its legal operation impaired, in the one Court, than in the other.

But this falls short of this case.   The effort of the complainant is not to contradict or to impair the legal operation of the deed to Livingston, but rather to charge Livingston, as the legal owner under the deed, with a trust arising out of an agreement *dehors* the deed, touching its object and the uses of the estate conveyed.

There is a well recognized distinction between contradicting a deed or impairing its legal operation, and raising out of the transaction an equity *dehors* the deed, binding the grantee's conscience to hold the land for the real purposes of the conveyance, and not according to its legal operation, when the latter use of it would, under the circumstances, work fraud.   Such an equity is held to be independent of the deed, and not excluded by it as a mere conveyance of the legal estate, unless there be in it some terms or implication to that effect.   To support such an equity, parol evidence is admissible, not as contradicting the deed, but as explanatory of the transactions out of

which the equity arises. In such case no allegation is, necessary that a declaration of the equity or trust was, through fraud or mistake, omitted in the deed, because, as the equity or trust arises out of the extrinsic circumstances, and is not at all dependent upon the face of the deed, it needs not, in order to effectuate it, that the deed be re-formed, or, which is the same thing, treated as if reformed. It is when the trust sought to be enforced is one to be raised upon the face of the deed, and not out of extrinsic facts or agreement, that an allegation of fraud or mistake is required.

Now, while it is certain that to charge the grantee, under an ordinary deed, with a trust, upon extrinsic evidence, especially upon parol evidence, is a jurisdiction to be exercised with caution, and only under cogent proof, such as the conscience of the Court cannot resist; still the jurisdiction is unquestionable. So far has the distinction been carried, between contradicting a deed and enforcing against the grantee equities springing out of the transaction, that, as is now generally held, a deed absolute on its face may, in a court of equity, upon parol evidence of the real transaction, be enforced as a mortgage or security for money, if the circumstances make sufficient equity to have it so treated, and that, too, although it may not appear that a defeasance, intended to be inserted, was omitted through fraud or mistake. 1 *Powell on Mortg.*, 151 *a* ; 1 *Hilliard on Mortg.*, 42 *&c.* ; *Hughes vs. · Edwards*, 9 *Wheat.*, 494 ; *Morris vs. Nixon's Ex'rs*, 1 *How.*, 121 ; *Strong vs. Stewart*, 4 *Johns. Ch. R.*, 167 ; *Slee vs. Man-hattan Co.*, 1 *Paige*, 48, *and 77 note* ; *Clark vs. Henry*, 2 *Cow.*, 324 ; *Van Buren vs. Olmstead*, 5 *Paige*, 9.

Whether in this State, an absolute deed may, upon parol evidence and without any allegation of fraud or mistake in the omission of a defeasance, be converted into a mortgage, is a question not yet decided. I forbear to express any opinion upon it. But there can be no doubt that the grantee of

the legal estate may be charged with trust *dehors* the deed, *i. e.*, one not declared in it, but springing from some agreement or arrangement contemporaneous with it, and of which the conveyance may, itself, be the consideration, and that, in the absence of any prohibitory Statute, such as the seventh section of the English Statute of Frauds and Perjuries, the agreement, or the circumstances which give birth to the trust, may be shewn by parol evidence if deed of bargain and sale is conclusive, so far as to pass the legal estate, no more ; that the beneficial interest attends the legal estate is always presumed and, *prima facie*, the legal estate passes clear of any trust ; but of this the deed is not conclusive. Of course I am understood to speak here of our ordinary deed of bargain and sale, which passes the legal estate without either declaring or excluding a trust. The usual clause in the deed, declaring the estate to be "to and for the only proper use and behoof" of the grantee, does not exclude proof of a trust. This phrase is added simply to raise a use which the statute can execute, and so pass the legal estate, but upon the legal estate thus created, a trust *dehors* the deed may be engrafted. This distinction between contradicting a deed and raising a trust upon it by extrinsic evidence, remains as one of the consequences of the complete separability of the beneficial, from the legal, ownership, although the difference between the legal estate and the use has become more technical than substantial. The distinction so pervades our law touching the conveyance of lands, and the creation of trusts, that only by legislation can it be controlled. Even the English Statute of Frauds did not abolish it. That Statute did not render a deed conclusive, as well of the beneficial interest as of the legal estate ; it permitted a trust to be raised *dehors* the deed. It only required that the evidence to prove such a trust should be written, and not parol, as before it might be, and this written evidence, required under the Statute, was far short of such as would be necessary, at common law,

to vary the legal operation of a deed ; any writing sufficiently manifesting the real intention of the parties, memoranda or letters of the party to be charged, were held sufficient. *Lewin on Trusts*, (97 *Law Lib.*,) 63.

Thus the Statute itself in allowing a trust, *dehors* the deed, to be raised by extrinsic evidence, provided it be in writing, plainly demonstrates that both before and under the Statute to charge a grantee with such a trust, does not contradict the deed ; and, plainly, if the raising of a trust under the Statute by means of any extrinsic, written evidence, does not contradict the deed, no more can the raising of such a trust by parol evidence, where the Statute is not in force, be held to contradict the deed. And, accordingly, in all those States where the Statute had not been re-enacted (except perhaps Connecticut,) the grantee under a deed has been held chargeable with a trust upon extrinsic evidence, whether written or parol, and without any restriction as to the kind of evidence admitted, except that, in North Carolina, a trust when raised by parol, must be by proof of facts and circumstances, excluding mere verbal declarations of the party to be charged. In one of these States, Ohio, there is a decision very direct to the point and well considered. *Fleming vs. Donahoe*, 5 *Ohio*, 255, before cited. The facts of that case have been already stated. It was a bill like the present one, for the re-conveyance of lands which had been passed by a deed absolute in form, upon the ground that the conveyance had been, in fact, made upon certain trusts, to prove which trusts, parol testimony was offered. The Statute of Frauds had not then been enacted in Ohio. The Court say, " can " a trust in lands be created by parol, and proven by " parol under a conveyance *prima facie*, absolute ? It is " conceded as a general principle that a deed or written " contract cannot be varied by parol. But is this a case of " that kind ? The object of the conveyance is not intended " to be expressed in the deed. The grant and considera-

"tion only is set forth. No rule of the common law "prohibited the creation of a trust by parol," * * * "such a trust was not considered as varying the terms of "the deed, but as setting up an independent contract," "or, it might, be added an independent equity, "consistent "with it."

And so in Pennsylvania, in *Murphy vs. Hubert, 7 Pa. St.*, 420, before cited, the Court, by C. J. Gibson, having first decided that parol trusts were not then prohibited by Statute in that State, held that oral declarations of the grantee in an absolute deed, touching its purposes, were held admissible evidence to charge her with a trust. In Virginia, as we have seen in the extract from President Tucker's opinion in the case from *7 Leigh*, 576, it was treated as settled law that, inasmuch as the Statute of Frauds was not in force there, a trust for a re-conveyance by the grantee in an absolute deed might be shewn by parol, or an absolute deed might be shewn to have been given as a mortgage.

The only authorities, not agreeing with this course of decisions, are the cases cited from North Carolina and an early case in Connecticut. The North Carolina cases are, *Kelly vs. Bryan*, 6 *Iredell's Equity*, 283 ; *Sowell vs. Barrett, Busbee's Equity* 50 ; and three cases reported consecutively in 1 *Jones' Equity*, 184, 193, 195. The rule as announced by Pearson J., delivering the opinion of the Court in *Kelley vs. Bryan* and *Sowell vs. Barrett*, and by Battle J., in the cases from 1 *Jones*, treats parol evidence of any kind, whether consisting of declarations or of acts and transactions of the parties, as being contradictory to the deed, and therefore inadmissible to convert the grantee into a trustee or mortgagee, unless the bill alleged that the declaration of trust, or clause of redemption was omitted from the deed " through ignorance, fraud, mistake or undue advantage." *Busbee's Eq.*, 194-5.

48

On this point the cases cited from North Carolina are against the current of authority in that State. It is remarkable that in the very case, which in the two opinions of Pearson J., (7 *Iredell's Eq.*, 287 ; *Busbee's Equity*, 54,) is relied on as the leading case in North Carolina on this whole subject, and such it certainly is, *Streator vs. Jones*, 3 *Hawks*, 423, after great consideration, relief was given against the grantee in an absolute deed, by holding him to be a mortgagee, upon parol testimony of the transactions against the denial of the answer,—and this, not only without allegation or proof that a defeasance intended to be inserted, was omitted through fraud or mistake, but, although it was stated in the bill, and was proved that the grantor, after first insisting upon a written defeasance, waived it, and signed the deed in its absolute form, trusting to the word of the grantee. This was in 1824. Long before this, as early as 1806, in *Gay vs. Hunt*, 1 *Murphy*, 111, parol evidence was admitted to establish a trust against the devisees of one Breilly, the grantee under a deed which was absolute in form, but was, in fact, made upon trust for the benefit of the grantor's son. No fraud or mistake in the form of a deed was alleged. It was a case of pure confidence. The answer denied the alleged trust, and set up a purchaser. Upon evidence taken to prove the trust, the precise question was made and sent up to the Supreme Court of North Carolina, whether, as the deed was absolute and the trust denied by the answer, parol evidence of it could be admitted. The Court say, " whether parol evidence will be admitted to set up a " trust, where a deed is absolute, depends much upon the " particular circumstances of each case in which it is " attempted. " In the present case, the Court are of " opinion that the parol evidence should be admitted, as " grantee did not take possession of the premises con- " veyed to him, nor call upon those in possession for an " account of the rents and profits, and this being contrary " to the ordinary effect of a sale, gives an impression of a

"trust of some kind between the parties, and admits the "introduction of evidence to explain the trust." 1 *Wash. Rep.*, 14.

So, in the later North Carolina cases, the grantee under an absolute deed has been held upon parol evidence to be either a trustee or mortgagee, although no fraud or mistake in the form of the deed was alleged. Such were *Howlett vs. Thompson*, 1 *Iredell's Equity*, 369 ; *Kemp vs. Earp*, 7 *Iredell's Equity*, 167. The rule to be gathered from current of North Carolina decisions on this subject is, that the form of the instrument is not conclusive with respect to the uses or objects for which the land is to be held— that, although, made absolute on its face, with knowledge of the parties, without fraud or mistake, still the grantee may be held to be a trustee or mortgagee upon parol evidence ; with this qualification, however, that the evidence must not be mere declarations of the parties, but it must shew facts and circumstances inconsistent with the idea of a purchase. I cannot but think, with much deference to the two learned Judges who delivered the opinion, in *Kelly vs. Bryan*, and the cases immediately following that case, that, in their expression of the rule, this point now before us was not distinctly considered. For although in all those cases there was no allegation in the bills filed of any fraud or mistake, still the Court entered fully into consideration of the parol evidence adduced, and rested their decisions upon the insufficiency of the evidence, and not upon the absence of fraud or mistake in the form of the deed, which, under the rule as stated, should have prevented any further investigation.

Besides the opinions delivered by Judges Pearson and Battle before cited, only one other instance is found in which parol evidence of a trust has been held to be contradictory to an absolute deed, and relief denied because fraud or mistake in form of the deed was not alleged. That is an early case in Connecticut, *Dean vs. Dean*, 6 *Conn.*

285, decided in 1826. The complainant, a weak minded person under advice had, by an absolute deed, conveyed to his sister, under an agreement to hold for his use, and to execute a declaration to that effect, but through neglect no declaration was executed. The sister died, and the bill was filed against her representatives for a re-conveyance. Parol testimony of the agreement was offered and rejected. Daggett J. says, " There is no allegation of " fraud, accident or mistake. "

" * * * The object of the bill is to effectuate this " parol agreement or, in other words, to convert an estate " absolute in the grantee, into a mere legal right, and to " obtain a decree that the whole beneficial itnerest shall be " vested in the grantor against his clear deed for a valuable " consideration, acknowledged to have been received, con- " veying the entire estate to the grantee. To do this " would be to contradict the rules of the common law in " relation to deeds or other instruments in writing, and, " also, the Statute of Frauds and Perjuries."

This decision holds a deed unimpeached for fraud to be absolutely conclusive, as well of the equitable as of the legal estate, and excludes any trust not declared in the deed itself. It even treats, as of no effect, the agreement between the parties, that a declaration of the trust should be executed and the *laches* of the grantee under the deed in not executing it ; which was clearly relievable upon the ground of fraud. That must be a narrow system of equity jurisprudence which this case represents.

The conclusion upon this point is, that, in our State, a court of equity may establish a parol trust of lands against a grantee under an ordinary deed of bargain and sale, the terms of which neither declare nor exclude a trust ; and this, although no fraud or mistake in the frame or phraseology of the deed be alleged.

Opinion :—whether admissions alone are sufficient evidence.

This brings us to a third question much discussed in the argument, viz : whether, even if a parol trust may be established against an absolute deed, verbal admissions by the parties charged are alone sufficient evidence of the trust, or whether there should not be required, as is the rule in North Carolina, proof of facts and circumstances *dehors* the deed, such as, "to the apprehension of men " versed in business and judicial minds, are incompatible " with the idea of a purchase, and leave no fair doubt that " a security " (or trust,) " only was intended." C. J. Ruffin, in *Blackwell vs. Overly, Iredell's Equity*, 44. It will be observed, the effect of the North Carolina rule goes quite beyond subjecting the evidence of admissions to a cautious reception ; it renders admissions, under all circumstances, incompetent alone to support a decree. In no other of the states, in which the seventh section of the English Statute of Frauds is not in force, has this rule yet been adopted.

No such rule seems to be of force in this State,—none prescribed by statute,—none as a part of the general law of evidence,—none as yet adopted by our Courts as specially applicable to this subject. I am not able, after much reflection, to adopt it. Admissions of a party, though a species of evidence are certainly liable to fraud and mistake, —evidence which should be reviewed cautiously and tested by its consistency with collateral facts, may, nevertheless, under some circumstances, become proof conclusive upon the conscience of the Court ;—as where the admissions are proved by a number of independent and unimpeached witnesses, are made in clear and unequivocal terms, and have respect to specific transactions of the party himself about which he could not be mistaken, and as to which he speaks against his interest. Admissions, so proved, will rarely, if ever, be found to be out of harmony with the real transactions between the parties relative to the subject-matter, although there may be, in some particulars,

a seeming incongruity of conduct. Where, however, this appears, there will generally be found some explanation in the relations and circumstances of the parties, if all these can be got at. Now, it must be obvious to reflection that, as in all these cases, the truth of the case is to be deduced from a consideration of all the circumstances, including declarations, acts and transactions of the parties, and all these almost infinitely varying in each case, any attempt to measure by artificial rules the relative force of these different species of evidence, rather hinders than helps to a safe conclusion. The comparative weight of the admissions of parties, and of their acts, can best be determined by a sound judicial discretion, applied to the peculiar circumstances of each case.

The North Carolina rule rests upon the assumed danger of admitting parol declarations, alone, to engraft trusts of land upon deeds absolute in form. But such danger is more apparent than real. In no case can the title of the grantee, under a deed absolute, be drawn into question collaterally. A trust can be asserted against him only by a bill in equity for the specific purpose ; all who can be in any way interested are made parties. Each step is taken deliberately and with notice ; ample opportunity is afforded to guard against surprise or perjury ; the Court has power to protect innocent third parties who may have acted upon the faith of the deed as it stood, and throughout the whole proceedings the grantee has the protection of the strong presumption in his favor arising from the face of the instrument. Much more serious, on the other hand, would be the danger of giving facility to fraud by artificial rules, restricting the means of inquiry into the real transaction which a deed is intended to effectuate. For, generally, deeds are, and the present is a signal instance of it, executed without attention to, or ability to understand, their technical phraseology and precise legal operation ; while, at the same time, the

original transaction and its purposes are, for the most part, without written evidence, resting upon parol testimony, and not unfrequently between the parties alone ; so that to hold such testimony insufficient, would practically leave remediless the majority of cases in which, through fraud or mistake, a deed made for one purpose is sought to be perverted to another.   The safer rule, for the general ends of justice, will be found to be to commit the question to the untrammeled conscience of the Court, upon such testimony as is admissible under the ordinary rules of evidence and appropriate to the transaction, at the same time, giving to the grantee the benefit of a strong presumption in his favor, arising from the absolute form of the deed, and requiring, in order to overcome it, such proof as, to a judicial mind, leaves no doubt of the existence and exact terms of the trust alleged.

Taking with us this test, we now approach the evidence in the cause, the weight of which covers the second general head of the discussion.

Having first examined and analyzed the evidence on both sides with the utmost thoroughness, considered each circumstance in detail, and then carried it, as a whole, upon my mind for several months, viewing it in every conceivable aspect, and testing, by time, the impressions made, I find it impossible to resist the conviction, and it is one free from doubt, that these conveyances were made in trust, that Livingston should, out of the rents and the proceeds of wood and timber to be cut and sold, pay Hall's debts, and then re-convey. The existence of this trust is proved by Livingston's admissions, frequent, unequivocal, and perfectly well established by proof. With respect to the acts and transactions of these parties, attending and following the conveyance, although some of them are, on their face, inconsistent with the idea of a trust, they do not overcome the force of admissions. And, first, as to the admissions, they are proved by the positive

testimony of eight witnesses, viz : Wm. Atkinson, Draper Hall, Rachel Hall, Andrew J. Maloney, Margaret Hall, Isaac Johnson, James Bradley and Joseph Parsons.—These witnesses are all unimpeached : five of them free from any supposed bias of relationship to complainant. They testify to admissions, distinct and independent, yet all consistent with each other, made at different times, extending through a period of six years, from 1859, to 1865. They are entirely positive, all as to the purport, and some as to the language used by Livingston, and there were circumstances naturally leading to the conversations, and impressing them upon the recollection of the witnesses. The declarations thus proved are unequivocal, bearing no other rational construction than that the lands were held in trust. The subject-matter to which they relate was a transaction of a specific nature, to which Livingston was a party, and about which he could not have been mistaken. They were seriously made. No motive or object on the part of Livingston to give to this transaction any false impression or color has been assigned, or is disclosed by the circumstances. He appears throughout all these transactions a serious minded man, cautious and shrewd, not given to trifle, or to needlessly compromise his own interest, which was the manifest effect of such admissions. Now, it must be evident, that, if such a body of admissions, so proved, may not support a decree, no amount of this kind of evidence, unaided by other proof, can be sufficient. By discarding the evidence before us, the Court would practically reject, altogether, this species of proof, and enact, judicially, a rule of exclusion, although the Legislature, in adopting the other provisions of the English Statute of Frauds, and omitting the seventh section, manifestly intended there should be no restrictive rule, but that trusts should be established by any species or mode of proof sufficient to satisfy the conscience of the Court.

The incipient steps to this transaction are disclosed

in a transaction with Livingston and Parsons in 1864. From that conversatinn it appears that Hall, at first hoped to save two of his farms by selling one to pay his debts ; but that, on consulting Livingston to this point, and upon examination of the records at Dover, the liens were found to be more than one farm could pay ; then, according to the statement of Livingston, himself, there was made by him the proposal upon which it was that these parties finally acted. "He then told Hall," so he says to Parsons, that if he (Hall) would deed him all the land, he would pay all the debts, or assist Hall in paying them. That by this proposal the lands were to be cleared of debts, for Hall's benefit is not here expressed in terms ; but what could be more clearly implied ? The saving of his lands, of two farms, at least, was the object for which Hall was seeking advice ; it was as a substitution for his own, ineffectual, plan for saving something, that Livingston proposed the deed to himself. Then, that the conveyance was to be temporary and provisional, merely, is demonstrated by the inducement, Livingston says, he held out to Hall, that after "he, (Liv- " ingston,) had a deed, no one else could enter judgment " against the lands,"—a reason which no ordinary purchaser, entitled to it by right of purchase, was likely to suggest, but a very sensible inducement to one about to convey land upon a secret trust for his own benefit. And so clear to the mind of Parsons was this, the object of Livingston's proposal, as Livingston then stated it, that Parsons in- stinctively inquired if Livingston " did not mean to deed "the land back to John Andrew Hall. Observe the sense " of the question ; not whether he would give, but whether " he would restore ; whether he would "deed the land back to Hall ;" and that Parsons, in this, rightly understood the sense of Livingston's proposal to Hall, the answer of Livingston conclusively shews ; for he does not as an absolute purchaser would have done, repel the suggestion as one unwarranted by what he had before said, but he

simply evades the question by saying that, "if he did, Hall would spend it." This would not have been the answer of an ordinary purchaser, neither, under the circumstances of these parties, can it be received as the answer of one meditating a gift of the lands to Hall, so far as to the obvious sense of the original proposal for the conveyance to Livingston, as he himself has related it. Proceeding further in this testimony, there needs to be no stress laid upon the testimony of Draper Hall, the complainant's father, although corroborated as it is by the statement of Livingston to Parsons ; there seems to be no reason to discredit it further than to suppose that Draper Hall's idea of a deed for seven years, he got from what he has since heard, and that it was not a deed for seven years, but simply a deed which he overheard Livingst n propose to Hall. The deeds were made, bearing di te, January 28th, 1859, but from the testimony, the execution, although begun by Hall on that date, was not perfected by the signature and acknowledgment of his wife until several weeks afterwards. Now it would be a fair presumption, were there no other evidence, that the conveyance was made pursuant to Livingston's proposal, as we have it in the testimony, and for its obvious object, viz ; to save the lands to Hall. But, waiving all presumptions, how abundant and conclusive is the testimony to that effect. And first is the conversation by Livingston with Sheriff Atkinson, which took place at the sale of Hall's goods, on the 28th of February, 1859, a month after the date of the deeds. Now, with respect to this conversation, there was a point much discussed which really does not seem material, viz : what Livingston meant by his inquiry of Atkinson on being informed that after the sale of Hall's goods, the next step was an inquisition which might result in condemnation and an elegit. I refer to Livingston's inquiry, whether he, Livingston, could not take the lands and pay the debts. Atkinson understood the sense of his question to be, whether he

could, after satisfying the conditions, hold the debts against
the land so as to satisfy himself out of them. The
defendant's counsel understood the inquiry to have been,
whether he could not hold the creditors off for seven years
if, within that time, he should be able to pay the debts.
Now, upon either theory, thus much his inquiry certainly
had in view, viz : to arrest further process, to pay the
debts,—to save the land to some body; but whether
he contemplated holding the creditors off for seven
years until he could satisfy them out of the lands, or
paying them speedily with his own means and reim-
burse himself out of the lands, is not certain, and is
not of the least consequence. The material question
is, for whose benefit were the lands to be cleared of debt,
whether in the one mode or the other? was it to be for
his own benefit, or for Hall's? On this point, at least, his
language to Atkinson was unequivocal and conclusive.
He says, that "he should have to take John's business in
hand," it was then a wholly disinterested work he was
proposing to himself, and as a reason for this, natural and
creditable to himself, he adds, " John," he says, "had
married his daughter ; he felt, therefore, an interest in
him ;" "John was not fit to take care of his own affairs."
The witness further on his examination under the defend-
ant's commission, stating the same conversation, adds
some expressions,by Livingston,more explicit, yet hardly
more conclusive in their effect. Livingston said "he
"would have to take hold of John and straighten him up,
"and try to save the land for him." This testimony is of
great weight, because the conversation was an extended
one, not casual, but deliberate, the statements by Living-
ston wholly unequivocal, made in Hall's presence while
the transaction was fresh, the conveyance being then
either *in fieri* or just completed ; and the conversation is
narrated by a witness whose substantial accuracy cannot
be questioned. So far, then, we have, from Livingston
himself, the original proposal for this conveyance, that it

was to be made in order to clear the lands for Hall ; and then his express declaration, to the same effect, after the deeds were executed or part executed. Next follows a series of like admissions made while he had the lands in charge. First, early after the deed was made, in the declaration to Rachel Hall, the wife of John's half brother, who, hearing that John had been sold by the Sheriff, about ten years ago, as she says, and anxious to know how he was getting on, asked Livingston how John was "making along ; to which Livingston replied, " pretty fair now ; he (Livingston) had taken this plan " to rent ; he thought with the rents of the places, and "what timber he could slamber, he could pay Andrew's "debts, and Andrew would still have the land." To her suggestion, that he should buy one or two of the places, Livingston replied, "he hadn't the means." Livingston's declaration to Maloney, about the same time, in the first or second year after he took Hall's lands, is not so explicit, but the meaning is too obvious to be doubted. To Maloney's inquiry whether "he thought he could clear "the land in seven years," Livingston replied, "if he "thought he couldn't, he wouldn't have taken it." The language is very significant of the purpose of the trust, that it was not as an ordinary purchase, but to save the lands. Observe also, that it was, as the witness states, "about John Andrew Hall's affairs," that they "fell to " talking, not about the ability of Livingston to disen- " cumber lands bought by him ; and manifestly it was with " reference to Hall's affairs and interests, that Livingston " was asked if he could clear the land in seven years."

Following these conversations with Rachel Hall and Maloney, was the conversation with Margaret Hall, John's step-mother, three or four years after Livingston had held the farms. Taking an occasion to quiet some dissatisfaction on her part, at his holding the farms, Livingston says to her, assuringly, "Mother Hall, you have been very "much vexed with me about these matters,—1 just took it

"to be a friend of John Andrew's," and then to shew precisely how John was to be thus befriended by him, he adds, "when the seven years roll around, it will be John "Andrew's, and all will be free." Again, he said, "you "have been vexed with me, because you thought I wanted "to keep this property. At the end of seven years, it will "all be John Andrew's again." The same assurance was given her in a conversation, later in the summer, before Livingston moved to Milford, *i. e.,* the summer of 1865.

In 1864, from some cause, it matters not what, Livingston's connection with these farms became a topic of some special interest in the neighborhood. Three conversations on the subject within that year appear in evidence ; those with Johnson, Bradley and Parsons,— Johnson being the tenant of the Marsh farm, while talking with Livingston, as he says, one Sunday about the farm, asked him, "how long he had this land in hand," a question evidently suggested by some general neighborhood understanding than Livingston held these lands in trust. The reply was, "seven years and then the land went back to John Andrew Hall," not as we must understand Livingston that his estate was so limited by the deeds, but according to the purport of the conversations with Maloney and Mrs. Hall, in seven years the lands, it was supposed could be cleared of debts, and the trust being then fulfilled, they would beeome John's again. Another witness, Bradley, proposed to rent the farm if Livingston would build a new house ; which Livingston declined on the ground of his inability ; adding also, "that at the end of seven years he expected "it (the farm) to go back to John Andrew Hall, and he "wasn't going to build for another man. The meaning of "this reply is too obvious to admit of the construction "attempted in argument, to be based upon the word "expected, " viz ; that he, the absolute owner might voluntarily restore the lands to John, should he behave himself well. Livingston's declarations to Parsons in the

same year have already been examined. We have seen that though less explicit in terms ; as to the object of the conveyance, they imply a trust almost as conclusively as words could declare it.

But to overcome the force of these admissions, it was insisted that certain transactions to which Hall was a party, were wholly incompatible with the alleged trust, and demonstrated that the conveyance was made to Livingston as a purchaser, such as the lease of one of the farms to Hall as a tenant in 1865 ; the written acknowledgement of sundry payments by Livingston, on account of the farms as property bought by Livingston—and the final acknowledgment of payments in full for the purchase. But these transactions, I feel obliged to say, find, in circumstances disclosed by the proof, an explanation not inconsistent with Livingston's admissions. That explanation is that Hall took part in them ignorant of their real nature, and confiding in Livingston that they were only carrying out the trust. Hall was not a *non compos ;* not even a fool in the usual sense. He could buy and bargain and sell in the ordinary course of his business as a farmer. The defendant's evidence proves this degree of capacity, no more. But his weakness was an easy going temper, disposed to take for granted what should be scrutinized, a confidence overweening, where given at all, and these traits, together with his extreme ignorance and unfamiliarity with legal forms, made him easy to be imposed upon in such business. The proof of these characteristics is abundant.

Passing by the testimony of his relatives, Margaret Hall, William Hall, Rachel Hall and Draper Hall—other witnesses not connected with him, and disinterested, apply to him these terms, " he is yielding and obliging,"— " he is very ignorant,"—" he is very confiding,"—" those whom he considers his friends, can do anything with him." So say Johnson, Jester, Cullen, Polk, Parsons,

Maloney and Bradley. Jester adds, that "he is not fit to act for himself drunk or sober ;" that "he has no capacity "to keep his mind on business, or to understand anything beyond a plain receipt, or something of that kind." Cullen says, that he had no mind for business "at any time, drunk or sober," would "submit to anything," "always needed a guardian." Parsons says, that he does not know "when he is getting value received." Bradley, that he "thinks every body his friend." Moreover, these characteristics are manifested by Hall, in all the transactions proved before the Court. They appear in his conduct respecting the deed, whatever may be assumed as the object of them, even upon the defendant's theory as conveyances to a purchaser.

The consideration, as the defendant Livingston, alleges, was $2400 ; no part of this to be paid upon the execution of the deeds, but $1,800 to be either applied—the liens— the residue, to wit ; $600 was to be either applied in discharge of debts which were not liens as might be approved by Hall, or paid to Hall himself, as he should thereafter direct ; so says Livingston in his answer. Yet, for the due application of this consideration, amounting to $2400, being Hall's whole worldly estate, no security was required, no bond, no written engagement or evidence of Livingston's obligation, not even parol evidence of it. The same overweening confidence and inattention marks the other transaction of Hall, relied on by the defense—the lease, and the two receipts. The parties go together before some one capable of drawing a legal instrument. Every thing is done upon Livingston's suggestion,—the nature of the paper drawn, and to some extent, the language, is at his dictation. Hall's whole share in the transaction is, simply, assent ; his action is wholly formal and passive. He makes no suggestion, he asks no questions ; does or says nothing to indicate that he really understood the nature and legal operation of the papers signed. His utter inattention to self protec-

tion in the matter of legal instruments is, perhaps, most strikingly manifest in the circumstance that there was, but one lease drawn, of which Livingston took possession. So the witness thinks, and the lease now comes from Livingston's possession. That Hall understood the precise effect of the two receipts is left the more uncertain because, upon the theory of either party, that of a trust to apply rents, and proceeds of wood and timber towards Hall's debts, or that of a purchase, for consideration money to be applied in like manner, there was occasion for some written acknowledgment, by Hall from time to time, of the sums so applied by Livingston, and the effect of such an acknowledgment as evidence, either that the lands were held in trust or by purchase, would depend upon slight variations of phraseology such as, even upon the reading of the paper, might well fail to arrest, and, indeed, was little likely to arrest, the attention of a person both so illiterate and confiding. This observation does not indeed apply to the lease. Hall must be supposed to have understood the nature of that upon the bare reading of it. But the making of this lease (at the time when it was made) does not help the defendants ;—to have force as evidence of an absolute purchase, against the proved admissions of Livingston, that the conveyance was upon trust, a lease should have been a natural, spontaneous and immediate recognition of a real charge of title then made under the deeds, and of a then created relationship of landlord and tenant ; as to the farm occupied by Hall, it should have been an act springing out of and in that way illustrating the nature of the original transaction : it should have been cotemporaneous with, or, at least, not long after, the execution of the deeds : yet this lease was made nearly seven years afterwards ; and, meanwhile, Hall remained on the farm, not only paying no rent, but without any proved demand of it by Livingston or recognition of his title required by Livingston, though shewn by all his transactions to be shrewd and watchful of his

interests. The lease would have given some support to the theory of purpose then formed, to abandon a trust, originally created, and thus to leave the conveyances absolute in fact as well as form, but this is not the case made by defendant's answer and therefore cannot be admitted.

The effect of the evidence as to this lease then, is about this: As an illustration of the original transaction and proof of a purchase from the beginning, its force is so far weakened by the long interval after which it was taken, that it does not overcome the proof or the effect of Livingston's admissions to the contrary. Then, again, what would have been a natural solution of the taking of a lease at a date long after the conveyance, viz: that the trust was abandoned is precluded by the answer. Now, what was the true explanation of this transaction, it is not material to inquire. I express no opinion about it and have sought to form none.

Some evidence was adduced by the defendants, of declarations made by Hall, inconsistent with the existence of the alleged trust. It consists of the testimony of White and Augustus Stutzer. White's testimony has been successfully impeached, and, under the rule of evidence, cannot be considered. As to young Stutzer, I do not question his veracity or even his accuracy. For supposing it to be true that Hall, understanding that the defendant, Stutzer, was in treaty with Livingston for some of this property, said that "he would make a good thing to buy it; that he (Hall) had owned (or had tilled) it and knew it was good land," still the force of such a declaration, by a party so ignorant and inconsiderate, weighs little, as against the oft-repeated and unequivocal counter declarations of Livingston. It must be set down as one of not a few incongruities presented between the conduct of each of these parties, and the theory of his case. On the whole, my conclusion is, that the transactions between these parties, are not, on their face, such

as might be expected from men of ordinary business capacity and experience in the case of a trust ; neither are they, in some respects, such as would usually attend a purchase, such as the total omission of any security, or acknowledgment for purchase money, and Hall's possession of one farm for six years, without any proved recognition, on either side, of a tenancy. Upon either theory of the transaction, Hall's conduct can be accounted for only by such a degree of ignorance and weakness, as leaves his transactions in business, involving any technical knowledge, without significance, and of not sufficient force to overcome the directness and conclusiveness of Livingston's repeated declarations respecting the trust. I feel obliged, therefore, to accept the declarations as evidence of the real transaction between these parties.

We now reach the special defense set up for Stutzer, which is that, holding the legal title by purchase from Livingston, for a valuable consideration paid, he cannot be affected by a prior equity without notice, and that he had no notice of the trusts, supposing there were any. That he purchased for a valuable consideration is not in dispute: but he is sought to be affected with notice, in having neglected to act upon the cautions received from William Hall and Jester, which it is insisted should have put him upon inquiry of John Andrew Hall himself.

Let us turn to the evidence upon this point. And first, as to the caution given by William Hall. Early in March, 1866, about three weeks before Stutzer's purchase, he called, in company with Joseph S. Lofland, upon William Hall, at Hall's residence. The object of this call was to ascertain if William Hall had any claim against the property, and particularly whether William Hall had any claim of title under the will of Winlock Hall, the grandfather of John Andrew Hall, under whom John Andrew took his title. Of the two witnesses examined to this interview, only William Hall undertakes to detail

the language of the conversation between himself and Stutzer.     He states it thus ;  Stutzer, "after a few words "of common talk, said ; 'have you anything against John " Andrew Hall?'" Witness replied, "Do not know whether " I have or not, do not know what you mean." Stutzer "replied, "Have you anything against his land?" Witness "replied that he had some judgments transferred to him "which were entered against the land.   Stutzer said, "I "have bargained for one of the farms."   Witness asked, "Who of?" Stutzer replied, "of Thomas M. Livingston." "Witness rejoined, "He has no more right to it than I "have ; he has never paid any more for it than I have, " and I have never paid anything."   Stutzer said ; "he has "got a deed."   Witness said, "If he has, it is all sham. " What are you to give?"   Stutzer said, " Twenty-five "hundred dollars."   Witness replied, "You have paid the "worth of it, now the timber is off."   Stutzer said, "I do " not expect to keep it, but to put some improvements " on it, and sell it."   He told Stutzer, the witness pro- ceeds to say—and here is the material point in the conversation—he told Stutzer "*that he understood that* "*Livingston had taken the land for seven years, to pay off* " *John Andrew's debts.*"   Hall then adds to his testimony, some circumstances seemingly out of their natural order. He says, " I told Stutzer, if John Andrew Hall died with- " out lawful heirs," he, (witness,) would be entitled to a part of it (the land) under the will of his father. Lofland said "Stutzer paid him twenty-five or thirty dollars for "his right."   Stutzer offered him twenty-five dollars for "his right. Witness declined to take it, saying he wouldn't " sell that he hadn't in his possession.   Stutzer and "Lofland then left.   Witness is certain he gave Stutzer " the information spoken of above."

The testimony of Lofland does not vary materially from William Hall's statement, except that he does not remember any suggestion by Hall, that Livingston held these lands in trust for John A. Hall, or that any question

of title was raised except as to William Hall's contingent interest under Winlock Hall's will. Lofland thinks he heard all the conversation. I am satisfied that William Hall did make the suggestion stated by him, viz: "that "he understood that Livingston had taken the land for "seven years to pay off John Andrew's debts," but that his remark made no impression upon the attention of either Stutzer or Lofland. Next as to the conversation between Stutzer and Jester, the latter states that "a little before "the time that Livingston traded the land for the store-"goods with Stutzer," he "heard the transaction spoken "of." He met, said Stutzer, in the town of Milford. Witness asked Stutzer if he and Tommy were going to trade. Stutzer replied, he "reckoned so ;—didn't know hardly." —Witness asked him if he knew whose land he was trading for. Stutzer replied, he did,—generally knew what he was about before he jumped into it. Stutzer then turned around and left. Whether this conversation occurred before, or after that with Wm. Hall, cannot be certainly determined from the testimony, though probably after, inasmuch as the confidence of Stutzer's answer implies that all objections to the title worth attention, as he supposed, were removed, and one, at least, remained at the time he visited Hall.

We are compelled to consider the effect of these cautions, for such is the proof relied on to affect Strutzer with notice of the trust.

To be sufficient prior notice of the trust, it must be found to satisfy a rule well settled, both in the courts of England and this country, which is this ;—It is upon the ground of *mala fides*, and not of mere want of caution, that the purchaser for value is affected with a prior claim, and, therefore, the notice to affect him must be more than would excite the suspicion of a cautious, and wary purchaser. It must have been so clear and undoubted, with respect to the existence of the prior right, as to make

it fraudulent in him, afterwards, to take and hold the property. It is not meant by this, that a purchaser can be affected only by some direct and positive communication from the party interested; notice may be implied from circumstances; but in such case, the circumstances relied on must be clear and unequivocal, *i. e.*, such as can be supposed to have left on the mind of the purchaser no reasonable doubt as to the existence of the prior right.

The leading authorities, among a great number on this point, are two decisions of Lord Hardwicke taken together, *Hine vs. Dodd*, 2 *Atk.*, 275; and *Le Neve vs. Le Neve*, 3 *Atk.*, 646; *Jolland vs. Stainbridge*, 3 *Ves. Jr.*, 478; and the late and interesting case of *Jones vs. Smith*, 1 *Hare*, 43, (23 *Eng. Ch.*); 1 *Phillips*, 244, (19 *Eng. Ch*). This case, decided as late as 1843, presents so elaborate a review of the prior English decisions, and, in its facts, so well illustrates the question, that we may well advert to it. The defendant, Smith, being about to advance money upon a mortgage of the husband's estate, inquired of the mortgagor and his wife whether any settlement had been made upon their marriage, and was informed that a settlement had been made of the wife's fortune only, and that it did not include mortgaged property, although, in fact, it did, and limited to the husband only a life estate with remainders in tail. Confiding in this representation, the defendant did not require the production of the settlement before advancing the money. After the husband's death, the bill was filed against the mortgagee in possession by the tenant in tail, under the settlement. It was conceded that the mortgagee had acted *bona fide*, but he was sought to be charged for his want of caution in resting satisfied with the statement of the parties, instead of requiring the production of the settlement for his inspection. The case underwent two arguments by very eminent counsel, among whom were Swanston, Turner, and Bacon, before Sir James Wigram, Vice Chancellor, and the other on appeal before Lord Lyndhurst,

both of whom, after full consideration, held the mortgagee not to be affected, The Lord Chancellor says, in conclusion, 1 *Phillips*, 257 : "I dont think, therefore, that the present " case goes beyond this ; that a prudent, cautious, and " wary person would have inquired further. The want of " that prudence, caution and wariness, is not sufficient " according to the decisions and principles which have " hitherto been acted on, to affect the party with notice. " I no not consider this a case of gross negligence ; and I " am of opinion that the party, having   acted *bona fide*, " and having only omitted that caution which a prudent, " wary and  cautious person might, and, probably, would " have adopted, is not to be fixed with notice  of this " instrument."

Another apt illustration of the rule is the case cited from 8 *N. H.*, 244, *Rogers vs. Jones*, where a deed, having been executed and delivered, was handed back to the grantee to have it recorded. Instead of having it recorded, the vendor sold to another person, shewing him the deed, but stating that it had never been delivered. The purchaser was held not charged for his omission to inquire further.   And so the same doctrine, that the purchaser is chargeable for *mala fides* and not mere incaution, has been uniformly held as against claims not of record, in this country under examinations of the question by the ablest Judges ; by Chancellor Kent, in *Dey vs. Dunham*, 2 *Johns. Ch. Rep.*, 182 ; by C. J.Gibson, in *Remo vs. Swope*, 2 *Watts*, 78 ; by C. J. Ruffin, in *Fleming vs. Burgin*, 2 *Iredell's Eq.*, 584 ; and by Judge Story, in *Flagg vs. Mann*, 2 *Sumn.*, 486. See also 4 *Kent*, (171) ; *Sugden on  Vendors*, *Ch.*, 21, *Sec.* 5, *par.*, 40 ; *Cruise on·Real Prop.*, *Title Deed*, *Ch.* 29, *Sec.*, 20, &c., *and note* ; 2 *White and  Tudor*, *Leading cases in Equity* 144, &c.

It may be observed that the cases, in which this rule has been discussed and settled, have chiefly arisen under registration acts, by which a prior unregistered deed is

postponed to the title of a subsequent purchaser for value and without notice, and that Hall's claim is not within our recording act. But there is no difference in principle, or upon authority, between the kind or measure of notice proper to affect the subsequent purchaser, whether his title is challenged under a prior unregistered conveyance of the legal estate, or under a mere equity or trust attaching to the legal title conveyed to him. The true object and construction of our recording act is, to extend to the purchaser ,for value, the like protection, and no more against a prior secret conveyance of the legal estate, which, without any statute, courts of equity have always afforded him against prior equities, merely. If we pursue this question further we shall find that the same principle, which holds the grantor under a prior unregistered deed to such notice as impeaches the *bona fides* of a subsequent purchaser, applies with equal stringency to the holder of a mere equity or trust, though it is not within the recording act. The principle is, that the prior grantee, under an unrecorded deed, is himself in laches, in neglecting the legally prescribed mode of protecting himself and all others by recording his deed; and thus the equities between the parties, so far as these depend upon any question of diligence, are at least equal. A prior claimant, who is himself in laches, cannot equitably follow the land, against a *bona fide* purchaser for value paid, merely because the latter has been betrayed into some incaution, and that, it may be, through the very neglect of the first claimant; for it is presumable that the due recording of the prior title would have deterred any subsequent purchaser, at least, one who is shewn to have examined the record, and hence it is upon a clearly equitable ground, that, under the recording acts, in order to effect a subsequent purchaser with notice, more than mere want of caution must shewn ; there must have been *mala fides*, or negligence so gross as to be demonstrative of it. Now the same principle applies, as well, to prior equity

which are not within the recording acts; for here, too, it will be found, generally, is not always himself that the prior claimant has been in laches. Take, for example, the case of Hall. He sets up against a subsequent purchaser from Livingston, a parol trust secretly reserved upon the conveyance made by him to Livingston. He was grossly negligent in not inserting the trust in his own deed, by doing which he could have effectually protected himself and all others seeking title under Livingston. His negligence was further aggravated by surrendering to Livingston, possession of the two tracts bought by Stutzer, thus constituting Livingston, before all the world, the absolute owner, and enabling him, as far as it was possible, to perpetrate fraud upon purchasers.

Now, although his conduct may be attributed to his mental facility before commented on, that is, a consideration to affect only Livingston, the man who dealt with him, and not third persons. There is another consideration applicable alike to all cases in which a purchaser is sought to be affected by a prior right, whether the recording acts, or otherwise, and leading to the same conclusion, viz : that the notice must impeach the *bona fides* and not the mere caution of the purchaser. It is that sound policy forbids that a 'title bought in good faith, and paid for, should be hazarded upon the question whether due diligence has been exercised in looking after prior latent rights, such as are not disclosed, either by the record, or by the deeds under which the purchaser takes his title. Such a question is altogether too uncertain to be a safe judicial test of the validity of the titles to real estate.

With respect to authority on this point, I find none which discriminates between the notice required to affect a purchaser in cases under the registry acts and in other cases. As might be expected, the cases are few in which the prior claim is a mere equity, not capable of being registered ; but in such as have occured, a rule of notice no less strict has been applied. Such was the early case of

*Wilgrove vs. Weyland*, adopted as a leading one in the text of Sir Edw. Sugden, *Ch.* 23, *Sec.* 1 *par.* 3 ; *Jolland vs. Stainbridge*, 3 *Ves. Jun.*, 474 ; *Flagg vs. Mann*, 2 *Sumn.*, 491. In one case, *Grimstow vs. Carter*, 3 *Paige* 421, the identity in principle between the position of a purchaser, in cases under the registry acts and in other cases on this point of notice, is expressly affirmed. A deed, absolute on its face but intended to operate as a mortgage, was given with a separate written defeasance, which latter was not recorded ; but the grantor remained in possession, and the question was, whether the grantor's remaining in possession was notice sufficient to affect a subsequent purchaser. Held by the Chancellor on appeal that, as possession of the estate by a person claiming a prior equity, not within the recording act, had been held to affect a purchaser of like effect, must be possession in cases under the recording acts ; because, as he says, there is no distinction between a purchaser in good faith, under the recording act, and a *bona fide* purchaser, within the decisions of courts of equity in other cases. *p.* 437.

We may now return to the testimony relied on to affect Stutzer with notice. The question will be, were the suspicions expressed by William Hall and Jester, sufficient notice of this trust to render it an act of bad faith in Stutzer to proceed without further inquiry to purchase the land and hold it against Hall ? I think not. Prior, and up to the conversation with William Hall, the *bona fides* and diligence of Stutzer is unquestionable. He had, upon two visits to Dover, with the aid of experienced counsel, examined the title papers and records, which is the mode legally prescribed and usually relied on for investigating title ; and against such defects and incumbrances as this examination disclosed, he had studiously guarded himself ; first by requiring Livingston's bond of indemnity against the liens ; then as to the risk of further issue of Draper Hall, John Andrew's father, which issue, if any, he was advised would be let into a share with John

Andrew, he had taken the pains to satisfy himself by seeing Draper Hall and his wife, that at their age there was no such possibility. Then again some claim on the part of William Hall, under the devise to John Andrew, having been suggested, we find Stutzer promptly repairing to Hall for satisfaction on this point. But William Hall's claim was to an interest contingent on John Andrew's dying without issue; so remote a possibility that Hall himself thought it not worth bargaining for, answering to Stutzer's offer of twenty-five dollars for it, that "he did "not sell that he hadn't possession of." Stutzer now felt himself relieved of the last objection to Livingston's title, disclosed by the customary modes of examination, or in any way known to him ; for it does not appear that, up to this moment, he had received the least intimation of any claim on the part of John Andrew Hall. Is it then at all surprising that at this juncture, Stutzer, finding that the only two supposed defects of title disclosed by the title papers had come to nothing, should even, as an ordinarily prudent man, not have been impressed by what was a mere vague suspicion thrown out by William Hall in the course of a conversation, Stutzer's interest in which, was directed to another point, *i. e.* William Hall's own claim ? What Hall said, material to our purpose, was, "that he "understood that Livingston had taken the land for "seven years to pay off John Andrew's debts." Now as notice to affect Stutzer, this suspicion of William Hall's was defective in two respects ;—(1) It only upon common rumor which has long and uniformly been held insufficient to charge a purchaser for value. *Sugden on Vendors, chap.* 23, *sec.* 1, *par.* 2, 3, 4 ; *Wildgrove vs. Wayland, Gold,* 147 *pt.* 67, cited in the text of Sudgen ; *Jolland vs. Stainbridge,* 3 *Ves. Jr.,478* ; *Jackson vs. Given,* 8 *Johns.,* 137. (2.) What Hall said "he understood," *i. e.* "that "Livingston had taken the land for seven years to pay off John Andrew's debts," taking it in the sense intended by Hall and understood by Stutzer, was fully answered by

the deed which Livingston held. Observe here what was the gists of William Hall's objection to Livingston's title, viz: that he had no deed, or, if any, that it was a sham ; that he held a mere temporary possession and management of the land *i. e.* for seven years, to pay off the debts. Neither Hall nor Stutzer were lawyers enough to know what, indeed, had been a point of serious discussion in this case, that John Andrew Hall could set up a trust against his deed. At all events it is clear that it was not to such a trust, but to the absence of any valid conveyance to Livingston that Hall's suspicion pointed ; and this, to Stutzer's mind, was satisfactorily answered by John Andrew's deeds to Livingston. Wishing to conform myself strictly to the proof, I say nothing of the effect which John Andrew Hall's conversation with young Stutzer must have had, if communicated to the father, in allaying all suspicion of claim from that quarter.

Then with respect to the conversation between Stutzer and Jester, the question put by Jester, whether he, Stutzer, "knew whose land he was trading for," expressed only vague and indefinite suspicion, pointing to nothing, and in itself carrying no notice. Such a hint might affect a purchaser where, and only where, his conduct, on receiving it, evinced that he had a suspicion of the truth, and willfully evaded further information. This would affect him with *mala fides* within one of the principles of implied or constructive notice, so clearly stated by Vice Chancellor Wigram, in *Jones vs. Smith*, 1 *Hare*, 55 (23 *Eng. Chan. Rep.*). Now Stutzer's reply, that he did know whose land he was trading for, that he "generally "knew what he was about before he jumped into it," turning around and leaving, might, taken alone, bear this construction ; but construed by all the circumstances, his whole conduct throughout the negotiation, his abrupt treatment of Jester's suspicion more naturally expressed an over-confidence in the title he was bargaining for ; a confidence inspired by the removal of all objections ap-

pearing upon the usual course of investigation, a course of investigation which, as he supposed, must disclose any existing effect of title.   His slang phrase "that he knew "what he was about before jumping into it," was a rough denial of what he took as an imputation upon his prudence.

On the whole, the testimony relied on fails to impeach the *bona fides* of Stutzer, shewing, at most, a want of extreme caution which is not sufficient to deprive him of his legal advantage against Hall, who stands affected by far more serious laches in having neglected to have the trust declared in his deed, not to speak of his omission, after knowledge of the negotiation which is proved, to caution Stutzer, his whole action, on the contrary, so far as it went, tending to allay suspicion of any claim on his part.

This view of the conclusiveness of the testimony is well supported by authority.   In *Wildgrove vs. Wayland*, an early case cited in the text of Sir Edward Sudgen, one man came to a person about to buy a house and told him to take heed how he bought it, for the vendor had nothing in it but upon trust for A. ; and another person came to him and told him it was not so, for the vendor was seized of the land absolutely.   The first proved to be correct ; yet the purchaser was held not to have notice.   A later, perhaps a stronger case, was *Joyland vs. Stainbridge*, 3 *Ves. Jr.*, 478.   It was a bill to set aside a long lease executed by the complainant's deceased father and which, by assignment, had come to the defendant.   The complainant's claim was as issue in tail under a will of his grandfather, which will had not been registered so long as to give the assignee of the lease, the defendant, constructive notice.   The bill charged actual notiee to the defendant before the purchaser of the lease, upon proof such as this ; that the complainant's mother had, on more than one occasion, before the defendant's purchase, cautioned him "not to have anything to do with the estate ;

"that it belonged to her daughter." The Master of the Rolls, Sir R. Pepper Arden, dismissed the bill, remarking, "I agree it is not sufficient to prove notice, to assert that "some other person claims a title ; yet all the evidence "given here is of that of sort." Upon these cases Sir Edward Sudgen, in his *Vendors and Purchasers, Ch.,* 23, *see.* 1, *par.* 2,3, 4, a book of authority in itself, lays it down that "vague reports, from persons not interested in the " property, will not affect the purchaser's conscience" and such has since been the acknowledged rule. *Hill on Trustees,* 762 ; *Sto., Eq. Jur.,* 400 ; 2 *White and Tudor's Lead. cas., in Eq.,* 148. It was applied by Kent C. J,, in *Jackson vs. Given,* 8, *Johns.,* 140, when the notice relied on to affect a purchaser was the statement of a third person about the time of the purchase, that " he had understood that Umphrey "(the vendor) had fooled away the lot and had sold it several times and did not consider " it worth his trouble to look about it ; " also by Judge Story in *Flagg vs. Mann,* 2 *Sumn.* 551.

Some cases were cited for the complainant to shew the sufficiency of notice in this case. In *Jackson vs. Cadwell,* 1 *Cow.,* 625, the defendant, at Sheriff's sale, under a judgment which had been paid, but not satisfied of record. He was held not to be a *bona fide* purchaser, partly because he was not proved to have paid any purchase money, and partly because he had been informed, on the day prior to the sale, that Edward C. Sanders (one of the adverse parties) "laid some claim to the premises" and had taken an indemnity against the claim. The taking of an indemnity was itself a clear ground upon which to affect the purchaser, and was the circumstance which controlled the decision. Savage, C. J., recognizes the authority of *Jackson vs. Given,* in *Pearson and wife vs. Daniel et al.,* 2 *Dev. and Bat,* 360, a purchaser of land against which the bill sought to establish a trust in favor of Pearson and wife, had been informed before the purchase by a third person, that "the Pearsons did have a claim to the land,

"although he believed they were too careless to prosecute "it." This was held to be sufficient notice ; but the few words in which the Court dispose of this point, clearly disclose that the Court treated the purchase, not as an act of mere incaution, but of bad faith..

"Having chosen," says Garton J., "to speculate upon the title after receiving this information, the defendant must abide the result." The ground on which the defendant was charged was *mala fides*, and, so far, the case is in harmony with the established rule ; whether the proof was sufficient to shew *mala fides* might be doubted, were it not that, not merely the bare words of notice or information, but the whole prior conduct in all the circumstances of the case enter materially into the question of *mala fides*. The general impression of the case in *Devereux & Battle* was suspicious, and it was a fact noted by the Judge that there was no proof that this purchaser had actually paid anything. In *Blake vs. Hayward*, 1 *Bailey*, 208, the purchase, though for value, was affected by a degree in equity, for the payment of money, against the vendor, and such claim was held, under South Carolina Statute, to be a lien like a judgment.

In the case of *Polk vs. Gallant*, 2 *Dev. & Bat.*, 395, the defendant was a purchaser, at Sheriff's sale, of an equity, and not of the legal title, and it was held that even if he had taken the latter, and much more if only of the former, it would have been subject to all equities against the defendant in the execution.

None of these cases, therefore, will answer the purpose for which they were cited.